**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

AHMADREZA NEZAMESLAMI, *et al.*,

   Plaintiffs,

           v.

DEPARTMENT OF HOMELAND
SECURITY and U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

   Defendants.

Civil Action No.
1:26-cv-00151-SDG

## OPINION AND ORDER

This case is before the Court on Plaintiffs' motion for a preliminary injunction [ECF 12]. Because Plaintiffs have not shown a substantial likelihood of success on the merits of their claim that the policies of Defendants Department of Homeland Security (DHS) and U.S. Citizenship and Immigration Services (USCIS) — policies that are holding up the adjudication of Plaintiffs' immigration benefit applications — should be set aside under the Administrative Procedure Act, Plaintiffs' motion is **DENIED**. However, undersigned may revisit this conclusion if the hold policies are not lifted within 60 days of this Order.

## I.    BACKGROUND

On November 26, 2025, an Afghan national named Rahmanullah Lakanwal allegedly drove to Washington, D.C. and shot two National Guardsmen deployed

there, killing one and critically injuring another.[1] News outlets reported that Lakanwal had worked with U.S. forces during the war in Afghanistan, notably in a CIA-backed unit of the Afghan special forces.[2] After Taliban forces retook the Afghan capital following the U.S.'s withdrawal, Lakanwal was evacuated from the country as part of Operation Allies Welcome.[3] Lakanwal was granted asylum in the U.S. in 2025.[4]

This case is not about Lakanwal or the senseless violence against two U.S. servicemembers, but the timing is impossible to overlook. The day after the attack in D.C., USCIS issued Policy Alert PA-2025-26, which directed its adjudicators to consider certain reported security and documentation weaknesses in the applicant's home country as "significant negative factors when reviewing immigration requests."[5] The accompanying press release explicitly tied the new

---

[1]    ECF 14, ¶ 321.

[2]    *See, e.g.*, Dan De Luce & Rich Schapiro, *D.C. shooting suspect was part of a CIA-backed unit whose veterans have struggled in the U.S.*, NBC News (Nov. 30, 2025, 8:35 AM), https://www.nbcnews.com/news/us-news/afghan-accused-shooting-2-national-guard-members-was-part-cia-backed-u-rcna246320 [https://perma.cc/YPZ7-Y99N]; Kaanita Iyer, *Who is National Guard shooting suspect Rahmanullah Lakanwal?*, CNN (Nov. 30, 2025, 6:27 PM), https://www.cnn.com/2025/11/30/politics/dc-shooting-suspect-rahmanullah-lakanwal [https://perma.cc/GH96-2HWV].

[3]    *Id.*

[4]    *Id.*

[5]    USCIS, PA-2025-26, *Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits* (Nov. 27, 2025), https://www.uscis.gov/sites/default/

guidance to the November 2025 shooting.[6] Defendants subsequently issued two policy memorandums that placed Plaintiffs' immigration applications in an indefinite hold. To understand the full context surrounding these policies, it helps to turn back to January 2025 before returning to recent events.

On January 20, 2025, the day of President Donald Trump's most recent inauguration, he issued an executive order stating: "It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025). The executive order directed Cabinet officials to identify resources needed to ensure that aliens seeking admission to the U.S. are "vetted and screened to the maximum degree possible" and to review the information needed from any other country to adjudicate immigration applications from its nationals, particularly in regard to security or public-safety threats. *Id.*

That review culminated in Presidential Proclamation No. 10949 (PP 10949). According to PP 10949, the review found that numerous countries were deficient in providing the screening and vetting information needed to prevent the entry of

---

files/document/policy-manual-updates/20251127-Discretion.pdf [https://perma.cc/GK9Q-Z6MF].

[6]    ECF 14, ¶ 323.

dangerous foreign nationals through the immigration system. *See* 90 Fed. Reg. 24497, 24498 (June 4, 2025). Based on these and other findings, PP 10949 fully restricted entry into the U.S. for nationals of 12 countries (including Afghanistan, Burma, Eritrea, Haiti, Iran, Libya, and Sudan), and partially restricted nationals from 7 other countries (including Cuba, Laos, Sierra Leone, and Venezuela). *Id.* at 24499.

Returning to December 2, 2025, six days after the Washington, D.C. shooting, USCIS issued Policy Memorandum PM-602-0192.[7] PM-602-0192 directed USCIS personnel to immediately: (1) place a hold on all asylum applications, regardless of the applicant's nationality; (2) place a hold on all benefit requests for aliens from the countries listed in PP 10949, regardless of the alien's entry date; and (3) conduct a "comprehensive re-review" of approved benefit requests for aliens from the countries listed in PP 10949 who entered the U.S. after January 20, 2021.[8] PM-602-0192 referred to President Trump's January 2025 executive order, the November 2025 shooting, and a thwarted terrorist attack by an Afghan

---

[7]   USCIS, PM-602-0192, *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries* (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf [https://perma.cc/Y5AV-M3XX].

[8]   *Id.* at 1. January 20, 2021 was the date of former President Joe Biden's inauguration.

national in November 2024 as background for the new policies.[9] In light of those "identified concerns," USCIS determined that it was necessary to conduct a "comprehensive re-review, potential interview, and re-interview of all aliens from high-risk countries of concern who entered the United States on or after January 20, 2021," and potentially others who had entered earlier.[10] As part of that process, USCIS implemented the adjudicative hold at issue here.[11] PM-602-0192 is clear that the hold "will remain in effect until lifted by the USCIS Director through a subsequent memorandum," and requests to lift the hold require approval from the USCIS Director or Deputy Director.[12] Lastly, PM-602-0192 stated that within 90 days USCIS would "prioritize a list for review, interview, re-interview, and referral to ICE and other law enforcement agencies as appropriate, and, in consultation with the Office of Policy and Strategy and the Fraud Detection and National Security Directorate, issue operational guidance."[13]

A few weeks later, President Trump issued Presidential Proclamation No. 10998 (PP 10998). PP 10998 built on the findings of PP 10949, concluding that the subject countries "have persistent, chronic vetting deficiencies," including

---

[9]    *Id.* at 2.

[10]   *Id.*

[11]   *Id.* at 2–3.

[12]   *Id.* at 3.

[13]   *Id.*

"poor civil documentation and recordkeeping practices, widespread corruption and fraud, unreliable or inaccessible criminal records, and unreliable government travel documents." 90 Fed. Reg. 59717, 59719 (Dec. 16, 2025). Having considered several foreign policy, national security, and counterterrorism factors, including the subject countries' "screening and vetting capabilities, information-sharing policies, and country-specific risk factors, including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals," PP 10998 expanded the list of countries subject to entry restrictions. *Id.* at 59720–22.

USCIS then issued Policy Memorandum PM-602-0194 to expand the "comprehensive review" and adjudicative hold to applicants from the countries newly subjected to entry restrictions by PP 10998.[14] PM-602-0194 identified 10 exceptions to the adjudicative hold that do not appear to be relevant here.[15] Like its predecessor, PM-602-0194 stated that within 90 days, "and in consultation with OP&S and the Fraud Detection and National Security Directorate, USCIS will

---

[14]   USCIS, PM-602-0194, *Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries* (Jan. 1, 2026), https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0194-PendingApplicationsAdditionalHighRiskCountries-20260101.pdf [https://perma.cc/T7NC-98QS].

[15]   *Id.* at 4–5.

prioritize a list for review, interview, and re-interview, and issue operational guidance."[16]

On March 3, 2026 (approximately 90 days after the issuance of PM-602-0192), the chief of USCIS' Office of Policy and Strategy, Andrew Good, executed a declaration in a case similar to this one, in the District of Massachusetts; the same declaration was filed on this Court's docket the next day.[17] According to Good's declaration, over the 90 days following the issuance of PM-602-0192, USCIS had implemented several changes to its screening and vetting practices, including reducing the validity period for certain categories of employment authorization documents; tightening requirements for the reuse of photographs for identity documents; conducting additional background checks, re-interviews, and merits reviews of refugee claims as part of Operation PARRIS, which appears to be tied

---

[16]    *Id.* at 5.

[17]    ECF 21. Good's declaration was originally filed in *Doe v. Trump*, No. 1:25-cv-13946-JEK (D. Mass Mar. 3, 2026), ECF 49-1. In filing Good's declaration on this Court's docket, Defendants request that the Court take judicial notice of the declaration "to establish the fact of such related filing." ECF 21, at 2 (cleaned up). However, merely acknowledging that Good's declaration was filed in another court, without accepting the truth of his sworn statements, would render Good's declaration essentially useless — the salient question is not whether Defendants actually did provide the 90-day updates required by the policy memoranda, but whether those updates revise the memoranda in a way that affects the Court's subject matter jurisdiction or the allegedly arbitrary and capricious nature of the agencies' action. For the purposes of Plaintiffs' motion, the Court will consider Good's declaration as some evidence that Defendants did in fact take the actions described therein.

to a USCIS fraud investigation in Minnesota; "developing system connectivity for automatic notifications of biometric matches and new criminal information"; implementing a policy requiring "a final arrest encounter review to verify criminal history and arrest record before final adjudication"; and requiring a final State Department consular database check for "identity verification, visa/travel history, employment history, and other relevant information related to national security, public safety, and fraud."[18]

Good's declaration also attests that USCIS established an internal process to lift holds on certain cases, requiring several layers of review, and that holds had been lifted for aliens vetted by Operation PARRIS; petitions for nonimmigrant visas for alien fiancé(e)s (Form I-129F), filed by U.S. citizens; Green Card petitions for alien relatives, filed by U.S. citizens (Form I-130); intercountry adoption applications; and South Africans seeking refugee status.[19] Good's declaration asserts that USCIS is working with the State Department to identify country-specific risk factors to help assess needed improvements in existing screening and vetting procedures; actively engaging in discussion, technical development, and planning to implement an enhanced vetting plan; and developing guidance to assist adjudicators in "aligning interview resources to the specific risks identified

---

[18]    ECF 21-1, ¶ 7.

[19]    *Id.* ¶ 8.

for each country."[20] Good's declaration does not indicate when these processes might be complete or when to expect a subsequent update.

USCIS issued its most recent update on March 30, 2026 (approximately 90 days after the issuance of PM-602-0194) regarding its "Strengthened Screening and Vetting."[21] The "Enhanced Screening and Vetting Practices" announced in the March 30 update appear to be the same as those described in Good's declaration, including shortening the validity period for employment authorizations, restricting the reuse of photographs, "[d]eveloping system connectivity," and requiring "final arrest encounter reviews" and State Department database checks.[22] The March 30 update also mentions "[i]ncreasing social media and financial vetting and community interviews."[23] The update further discloses that certain holds had been lifted as described in Good's declaration, and with regard to certain (but unspecified) special immigrant visa petitions, employment authorization documents, and asylum applications from non-high-risk countries.[24] Like Good's declaration, there is no indication of when these processes might be complete or when to expect a subsequent update.

---

[20]   *Id.* ¶¶ 9–11.

[21]   ECF 32.

[22]   *Compare id.* at 3–4, *with* ECF 21-1, ¶ 7.

[23]   ECF 32, at 3.

[24]   *Id.* at 4.

## II.    APPLICABLE LEGAL STANDARD

To obtain preliminary injunctive relief, the moving party must demonstrate: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). A preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Id.* (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)) (internal quotation marks omitted).

## III.    DISCUSSION

Plaintiffs are predominately nationals of Iran, though some hail from Zimbabwe, Venezuela, Afghanistan, Nigeria, Sierra Leone, Malawi, Libya, Syria, Haiti, Burma/Myanmar,[25] Benin, Tanzania, Laos, Gambia, Cuba, Mauritania,

---

[25]    In 1989, the military government of Burma changed the country's name to "Myanmar." *Min Thiha Tun v. U.S. Att'y Gen.*, 343 F. App'x 411, 412 (11th Cir. 2009). Because the proclamations refer to the country as Burma, this Order will do the same. *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 45 n.1 (1st Cir. 1999) (noting that, because "the federal law refers to Burma, we use Burma throughout this opinion. This device is meant only for the ease of the reader and is not intended to express any view regarding the name Myanmar."), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

Sudan, and Eritrea.[26] Plaintiffs have filed various immigration applications, predominately applications for adjustment of status (I-485) and for employment authorization (I-765),[27] which are currently subject to the adjudicative hold. Some Plaintiffs have nonimmigrant status that expires in the coming months, absent a decision on their pending applications.[28]

Plaintiffs seek a preliminary injunction under the Administrative Procedure Act (APA) against the enforcement of Policy Memoranda PM-602-0192 and PM-602-0194 (together, the Benefits Pause Memos) and Policy Alert PA-2025-26 (the Negative Factors Policy), which would place their applications in an adjudicative hold and use their national origin as a negative factor in the adjudication of their applications. Defendants oppose the motion on subject matter jurisdiction

---

[26]   ECF 14, ¶¶ 6–311.

[27]   Adjustment of status is a process that allows an alien to apply for lawful permanent resident status (commonly known as applying for a Green Card) when the alien is present in the U.S. *See* USCIS, *Green Card Processes and Procedures: Adjustment of Status*, https://www.uscis.gov/green-card/green-card-processes-and-procedures/adjustment-of-status [https://perma.cc/8UJ2-QMGX] (last updated Apr. 23, 2026). Those eligible may file a Form I-485 to apply. *See id.*

Certain aliens with pending immigration applications, including adjustment of status and asylum, are required to apply for permission to work. *See* USCIS, *Green Card Processes and Procedures: Employment Authorization Document*, https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document [https://perma.cc/GCM6-34SA] (last updated Oct. 30, 2025). Those eligible may file a Form I-765 to apply. *See id.*

[28]   *E.g.*, ECF 14, ¶¶ 11, 13; ECFs 12-3, 12-5.

grounds and further contend that their actions were not arbitrary and capricious under the APA. Undersigned will address the Benefits Pause Memos and the Negative Factors Policy separately. However, because Plaintiffs have not shown a substantial likelihood of success on the merits of their claims for either, their motion for a preliminary injunction is denied.

### A.      The Benefits Pause Memos

While the Court may properly exercise subject matter jurisdiction over Plaintiffs' claims regarding the Benefits Pause Memos, Plaintiffs have not shown at this stage that they are substantially likely to succeed on their claim that the Memos should be set aside as arbitrary and capricious under the APA.

### 1.      Subject Matter Jurisdiction

Defendants argue that subject matter jurisdiction is lacking for three reasons: (1) the INA precludes judicial review of the pace of adjustment of status applications; (2) decisions relating to adjustment of status applications and employment authorization are committed to Defendants' discretion; and (3) the Benefits Pause Memos are not final agency decisions subject to judicial review. However, because the Memos represent Defendants' refusal to decide Plaintiffs' applications, rather than a mere delay, and legal consequences flow from the Memos, the Court may exercise subject matter jurisdiction here.

### *i.* **Judicial Review Under the Immigration and Nationality Act (INA)**

"Administrative action is presumptively subject to review by the courts." *Kanapuram v. Dir., U.S. Citizenship & Immigr. Servs.*, 131 F.4th 1302, 1306 (11th Cir. 2025) (citing *Kucana v. Holder*, 558 U.S. 233, 251 (2010)). However, the presumption may be "overcome by 'clear and convincing evidence' of congressional intent to preclude judicial review." *Id.* (citing *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993)). The INA expressly provides that some matters are not subject to judicial review, including, as Defendants suggest here, "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title." 8 U.S.C. § 1252(a)(2)(B)(ii).

The question, then, is whether the Memos fall within the discretionary authority granted to Defendants by the INA. Under 8 U.S.C. § 1255(a), "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, *in his discretion and under such regulations as he may prescribe*, to that of an alien lawfully admitted for permanent residence," if certain conditions are met. (Emphasis added.) Thus, § 1252(a)(2)(B)(ii) "precludes jurisdiction over challenges to USCIS delays in

13

adjudicating Form I-485 adjustment of status applications." *Kanapuram*, 131 F.4th at 1306–07 & n.2 (collecting cases).

But this case does not involve a simple delay in the processing of Plaintiffs' applications. Rather, Defendants have put in place a policy that declines to adjudicate Plaintiffs' applications, for an indefinite period of time. At issue in *Kanapuram* was USCIS's "visa retrogression hold" policy, under which USCIS "delay[s] the grant of Form I-485 applications when the Department of State indicates that annual visa limits have been reached." 131 F.4th at 1307. Because that policy requires that a visa be available at the time the application is filed and at the time of approval, and because visa availability fluctuates based on State Department estimates, "it is possible that an individual applicant could have been eligible to apply for adjustment of status on one day, but ineligible the next." *Id.* at 1305 (quoting *Cheejati v. Blinken*, 106 F.4th 388, 392 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 1126 (2025)). When those previously eligible applicants become ineligible, USCIS and the State Department hold the applications in abeyance until a visa becomes available. *Cheejati*, 106 F.4th at 392.

Here, Defendants have adopted a policy that "place[s] an adjudicative hold on all pending benefit requests submitted by or for aliens from the high-risk

14

countries identified in PP 10998."[29] That hold remains in effect until lifted or modified by USCIS' director.[30] Thus, unlike the hold policy in *Kanapuram*, which simply awaits the availability of a visa based on State Department estimates, the hold at issue here is, by its own terms, indefinite. That distinction is significant, because "a panoply of courts have found that 'while it is undisputed that the substance of the Attorney General's[31] decision is discretionary, he does not have discretion to decide not to adjudicate at all.'" *Bowser v. Noem*, No. 26-CV-10382-AK, 2026 WL 555624, at *4 (D. Mass. Feb. 27, 2026) (quoting *Tang v. Chertoff*, 493 F. Supp. 2d 148, 154 (D. Mass. 2007) (collecting cases)). Although the Benefits Pause Memos provide that the hold "allows a case to proceed through processing, up to final adjudication,"[32] Plaintiffs cannot obtain the sought-after benefits (or appeal the denial of benefits, as applicable) without a final adjudication. Because the INA does not give Defendants discretion to decline to adjudicate applications in perpetuity, it does not preclude judicial review of the Benefits Pause Memos.

Confusingly, Defendants argue that judicial review of Plaintiffs' claims is precluded by § 1252(a)(2)(B)(i) under *Kanapuram*. But *Kanapuram* concluded that

---

[29]   PM-602-0194, at 3.

[30]   *Id.*

[31]   "References to the Attorney General in § 1255(a) are deemed to be references to the DHS and USCIS." *Kanapuram*, 131 F.4th at 1307 n.3.

[32]   PM-602-0194, at 1 n.2.

the jurisdiction-stripping provision of § 1252(a)(2)(B)**(ii)** applied and therefore expressly declined to address § 1252(a)(2)(B)**(i)**. 131 F.4th at 1309 n.4. Nor have Defendants explained how their policy of not adjudicating Plaintiffs' applications constitutes a "judgment regarding the granting of relief under section . . . 1255." § 1252(a)(2)(B)(i). As Plaintiffs point out, the Ninth Circuit has interpreted § 1252(a)(2)(B)(i) "as precluding review of a judgment an agency makes in the course of adjudicating an individual application for relief, but not collateral actions challenging general policies and procedures." *Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1009 (9th Cir. 2024).

### *ii.*   **Final Agency Action Under the APA**

Under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." *LabMD, Inc. v. Fed. Trade Comm'n*, 776 F.3d 1275, 1278 (11th Cir. 2015) (quoting 5 U.S.C. § 704). An agency action must satisfy two requirements to be final: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The Supreme Court has counseled that the correct approach to the question of finality is a "pragmatic" one. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

First, the Benefits Pause Memos are not merely tentative or interlocutory in nature. While the Memos contemplate some further action within 90 days, the hold placed on Plaintiffs' applications is indefinite. The significance of the contemplated further action is also unclear. When the district court in *Varniab v. Edlow* pressed the government on this point, the government could not explain what the "prioritized list for review" was, how that list would impact the application process, or what type of guidance was expected. No. 25-CV-10602-SVK, 2026 WL 485490, at *15 (N.D. Cal. Feb. 20, 2026). Since this Court's hearing in March on Plaintiffs' motion, Defendants have submitted copies of the 90-day updates.[33] However, those updates contain no indication that the hold has been lifted for any Plaintiff in this case, and Plaintiffs point out that the groups identified in the March 30 update as exempt from the hold do not appear to be those subject to the Memos in the first place. Nor do the updates themselves contain any specific expectation of future guidance.[34]

Even if the hold is subject to change in the future, "all laws are subject to change. Even that most enduring of documents, the Constitution of the United States, may be amended from time to time. The fact that a law may be altered in

---

[33]    ECFs 21, 32.

[34]    Defendants referred to the adjudicative hold in their briefing as a "90-day pause." ECF 19, at 17. However, it is now clear that the hold did not end after 90 days.

the future has nothing to do with whether it is subject to judicial review at the moment." *Bowser*, 2026 WL 555624, at *5 (quoting *Appalachian Power Co. v. Env't Prot. Agency*, 208 F.3d 1015, 1022 (D.C. Cir. 2000)); *see also U.S. Army Corps of Eng'rs*, 578 U.S. at 598 (noting that the potential for revision "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal"). As it stands, Defendants have consummated their decision that the applications of Plaintiffs (and those like them) will not be adjudicated for the indefinite future, for the reasons stated in the Memos and the underlying presidential proclamations. There is no longer an express expectation that that will change in the near term. The fact that Defendants are improving their screening and vetting processes—as one hopes they would be doing anyway in perpetuity—does not change the fact that Plaintiffs currently have no path to a decision on their applications.

Second, it is clear that legal consequences will flow from the Memos. Many Plaintiffs appear to be lawfully present in the country under various nonimmigrant statuses, including as students (F-1) and employees in specialty occupations (H-1B).[35] For example, Plaintiff Mohammad Mahdi Khavandi has a pending I-485 application, but his current J-1 status is set to expire this year, and he will not be able to begin a medical residency in the U.S. without an adjudication

---

[35]   The immigration status of other Plaintiffs is unclear from the record, though there has been no suggestion they are here illegally.

18

of his application.[36] Similarly, Plaintiff Sina Layazali has a pending I-485 application but will lose his F-1 status after graduating from school this summer.[37] Absent a decision on their applications, Khavandi, Layazali, and other Plaintiffs' lawful status will expire, putting them at risk of arrest and removal. Similarly, Plaintiffs' employment authorizations will also expire, leaving them either unable to support themselves or facing the prospect of working illegally to survive. These are just some of the legal consequences that flow from the Memos.

Accordingly, the Memos are final agency actions under *Bennett*, and so they are subject to judicial review.

### 2.    Arbitrary and Capricious Review Under the APA

Plaintiffs argue that the Benefits Pause Memos should be enjoined under the APA for three reasons: (1) Defendants failed to adopt a reasoned explanation for the Memos; (2) Defendants' reasoning for the Memos was internally inconsistent; and (3) the Memos exceeded Defendants' lawful authority.

Under the APA, the Court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is "exceedingly deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). To make this determination, the Court

---

[36]    ECF 12-3.

[37]    ECF 12-5.

"must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990)). While the "inquiry must be 'searching and careful,' . . . 'the ultimate standard of review is a narrow one.'" *Id.* (quoting *Skinner*, 903 F.2d at 1538). Agency action will be set aside as arbitrary and capricious where: (1) the agency relied on factors that Congress did not intend for it to consider; (2) the agency failed to consider an important aspect of the problem; (3) the agency explained its decision in a way that runs counter to the evidence; or (4) the action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Mendoza v. Sec'y, Dep't of Homeland Sec.*, 851 F.3d 1348, 1353 (11th Cir. 2017) (citing *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1115 (11th Cir. 2013)).

### i.    Defendants' Reasoning in Adopting the Benefits Pause Memos

Plaintiffs' first two arguments take issue with Defendants' reasoning in support of the Memos. In particular, they argue that the Memos are arbitrary and capricious because Defendants have not provided a reasoned explanation for imposing the adjudicative hold based only on the applicant's nationality, without regard to the applicant's current immigration status, particularly in light of the processes that are already in place and the burdens placed on applicants and their beneficiaries, some of whom are U.S. citizens. They further argue that the Memos'

reasoning is internally inconsistent, as the adjudicative hold prevents applications from being denied, and those denials might trigger Defendants to begin removal proceedings. At this stage, Plaintiffs have not carried their burden to show that the Memos are arbitrary and capricious.

The Memos are clearly an extension of the earlier presidential proclamations, PP 10949 and PP 10998. Among other things, the proclamations concluded—and Plaintiffs have presented no evidence to the contrary—that Iran is "a state sponsor of terrorism," "regularly fails to cooperate with the United States Government in identifying security risks," "is the source of significant terrorism around the world," and "has historically failed to accept back its removable nationals." PP 10949, 90 Fed. Reg. at 24500. As for Afghanistan, the proclamations found that the country is controlled by the Taliban, a "Specially Designated Global Terrorist . . . group," "lacks a competent or cooperative central authority for issuing passports or civil documents," and "does not have appropriate screening and vetting measures." *Id.* at 24499. The proclamations further note that Afghanistan has visa overstay rates of almost 30% for certain nonimmigrant visa categories. *Id.* Similar findings were made as to the other countries subject to the Memos. *See, e.g., id.* at 24501 (finding that Sudan "lacks a competent or cooperative central authority for issuing passports or civil documents," "does not have appropriate screening and vetting measures," and

21

has visa overstay rates of almost 30%). The Memos expressly rely on the findings of PP 10949 and PP 10998.[38]

The timing of the release of PM-602-0192 is surely not coincidental, having been issued less than a week after the alleged November 2025 shooting in Washington, D.C. by an Afghan national. But PM-602-0192 is not based solely on the November 2025 shooting—in context it is clear that the shooting is presented as an example of "what a lack of screening, vetting, and prioritizing expedient adjudications can do to the American people," given the findings of the proclamations.[39] Plaintiffs have not shown any notable inaccuracies in the factual findings of the proclamations or the Benefits Pause Memos. Thus, undersigned cannot say at this stage that there was *no* reasoned explanation for the Memos' adoption.

The Memos are not necessarily internally inconsistent either. One potential consequence of the adjudicative hold is that certain applications will not be denied,

---

[38]   *See, e.g.*, PM-602-0192, at 3 ("USCIS will conduct a thorough review on a case-by-case basis to assess benefit eligibility including whether . . . [t]he alien is unable to establish their identity as outlined in PP 10949."); PM-602-0194, at 2 ("Following the continued review since the issuance of PP 10949, as well as the responses of foreign countries to that proclamation, the United States Government has identified additional countries that are unable to meet basic criteria for identifying their nationals and residents who may pose national security and public safety risks, or for sharing necessary information with the United States.").

[39]   PM-602-0192, at 2.

which otherwise might trigger Defendants to initiate removal proceedings. But it is not clear that this is the only way—much less a particularly effective way—to remove aliens who, despite having been previously admitted, pose a national security threat. While there may be some marginal benefit to national security and the integrity of the immigration process to root out those applicants, that benefit is compared against the potential consequences of adjusting applicants' status to that of a legal permanent resident. As the proclamations note, "[t]he United States affords lawful permanent residents more enduring rights than it does to nonimmigrants," and so "[l]awful permanent residents are more difficult to remove than nonimmigrants, even after national security or public safety concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals." PP 10998, 90 Fed. Reg. at 59721. The vetting done to decide whether to adjust an alien's status to that of a lawful permanent resident depends in part on the available documentation from the applicant's home country. Undersigned cannot say that the trade-off between ensuring fewer screening and vetting lapses in the admission of lawful permanent residents versus forgoing some deportations is so inconsistent as to be a clear error of judgment on Defendants' part.

However, these considerations do not necessarily extend to other immigration applications. For instance, it is unclear how these considerations are

23

relevant to an application for work authorization filed by a lawfully admitted alien pending a decision on his adjustment of status application.[40] Whatever the risks of admitting these individuals, those risks have already been consummated, and they do not appear to counsel in favor of preventing those individuals from supporting themselves through employment. Defendants point to the fact that a pending I-485 is a prerequisite for work authorization, but that is a non-sequitur. Plaintiffs' I-485 applications are pending because Defendants decline to adjudicate them.

Undersigned notes here that several district courts around the country have granted preliminary injunctive relief on similar claims. *See Varniab*, 2026 WL 485490; *Bowser*, 2026 WL 555624; *Doe v. USCIS*, No. 1:26-cv-02389 (N.D. Ill. Mar. 26, 2026), ECF 33; *Behdin v. Edlow*, No. 26-CV-00566-SVK, 2026 WL 1031079 (N.D. Cal. Apr. 16, 2026); *Karimi v. Mullin*, No. 5:26-CV-5049, 2026 WL 1103448 (W.D. Ark. Apr. 23, 2026); *Saghafi v. Edlow*, No. CV GLR-26-100, 2026 WL 1127468 (D. Md. Apr. 24, 2026); *Doe v. Trump*, No. 1:25-CV-13946-JEK, 2026 WL 1170971 (D. Mass. Apr. 30, 2026); *Meschi v. Edlow*, No. 26-CV-01993-AGT, 2026 WL 1157151

---

[40] 8 C.F.R. § 274a.12(c)(9) provides that an alien who has filed an adjustment of status application may apply for work authorization, which must be granted for the alien to accept employment.

(N.D. Cal. Apr. 29, 2026).[41] Those courts have generally reasoned that, in the context of APA arbitrary and capricious review, the Memos failed to adequately consider the applicants' considerable reliance interests or the alternatives within the ambit of existing policy. *See, e.g.*, *Varniab*, 2026 WL 485490, at *19 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) and *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020)) ("the agency must also provide a 'reasoned explanation' for disregarding 'serious reliance interests' stemming from the prior policy" and "must also show consideration of 'alternatives . . . within the ambit of the existing policy'"); *Bowser*, 2026 WL 555624, at *7–*8; *Doe*, No. 1:26-cv-02389, ECF 33, at 7–8; *Behdin*, 2026 WL 1031079, at *21–*22; *Karimi*, 2026 WL 1103448, at *9–*10; *Saghafi*, 2026 WL 1127468, at *9–*10; *Doe v. Trump*, 2026 WL 1170971, at *18 (similar); *Meschi*, 2026 WL 1157151, at *1 (adopting the reasoning of *Behdin*).[42] However, as stated previously, undersigned concludes that adjustment of status applications, as well as other applications that would confer

---

[41]  *Doe v. USCIS*, *Behdin*, *Karimi*, *Saghafi*, *Doe v. Trump*, and *Meschi* were all filed with the Court by Plaintiffs as notices of supplemental authority. *See* ECFs 28, 38, 39, 40, 46. Plaintiffs also filed a notice that Judge Burroughs of the District of Massachusetts issued an electronic order granting what appears to be a similar injunction, but that order appears to memorialize an earlier bench ruling, the reasoning of which has not been made available to undersigned. *See* ECF 35.

[42]  All of these opinions conclude that subject matter jurisdiction exists for the APA challenge to the Benefits Pause Memos, along the same lines as this Order.

lawful permanent resident or U.S. citizen status, stand on a different footing than applications for employment authorization. Indeed, the injunctions in *Bowser*, *Behdin*, *Karimi*, and *Meschi* were limited to those plaintiffs' I-765 employment authorization applications. Undersigned would consider a more narrow, renewed motion from those Plaintiffs who can demonstrate irreparable harm from Defendants' refusal to adjudicate their I-765 applications.

> ### ii. Whether the Benefits Pause Memos Exceed the Authority of § 1182(f)

Plaintiffs also argue that the Benefits Pause Memos exceed Defendants' authority under 8 U.S.C. § 1182(f) because § 1182(f) does not apply to stateside immigration benefits. Section 1182(f) "grants the President broad discretion to suspend the entry of aliens into the United States." *Trump v. Hawaii*, 585 U.S. 667, 683–84 (2018). But Plaintiffs have already gained lawful entry into the United States. Thus, it is not clear that § 1182(f) provides legal authority for the Memos.[43]

---

[43] Undersigned notes that, in *Trump v. Hawaii*, the Supreme Court construed § 1182 to "define[ ] the universe of aliens who are admissible into the United States (and therefore eligible to receive a visa)." 585 U.S. at 695. Further, § 1255(a) requires that an alien be "eligible to receive an immigrant visa and [be] admissible to the United States for permanent residence" in order to adjust status. Thus, there is some support for the proposition that § 1182(f) could support a suspension of Plaintiffs' adjustment of status, but Defendants did not make that argument, and so undersigned will not consider it further. *But see Doe v. Trump*, 2026 WL 1170971, at *16 (holding that § 1182 is "inapposite where, as here, the challenged policy concerns domestic processing of benefit applications by noncitizens already admitted into the United States").

Defendants did not appreciably respond to this argument. Setting that aside, undersigned concludes that the Memos can stand apart from § 1182(f). As mentioned previously, "§ 1255(a) gives the Department of Homeland Security and USCIS broad discretion to determine and implement the adjudicative process for Form I-485 applications, within the bounds set by statute." *Kanapuram*, 131 F.4th at 1307. So, it seems clear that Defendants have the statutory authority under the INA to enhance their screening and vetting processes, particularly in response to a terrorist attack by a foreign national admitted through the immigration process, which could at least *suggest* that the current processes are inadequate to protect national security. It follows that such enhancements require some amount of time to investigate and implement. Stated plainly, the screening and vetting enhancements announced in the Memos are a valid exercise of Defendants' discretionary authority under § 1255(a) to adjust the status of aliens present in the U.S., and so Defendants need not rely on § 1182(f).

### *iii.* Summary

The issue here is what to do with Plaintiffs' applications until Defendants' enhancements are complete. Undersigned approaches this question differently here than in the subject matter jurisdiction analysis—just because legal consequences will flow from the Memos does not mean that the APA grants this Court the authority to spare Plaintiffs from those consequences. It appears well-

settled that Defendants do not have the discretion to *never* adjudicate Plaintiffs' applications at all. But if the Memos truly are a pause, and Defendants truly are working towards an enhanced screening and vetting process in good faith, then the policy is not arbitrary and capricious. As Defendants agreed at the preliminary injunction hearing, the length of the pause is relevant.[44]

The Benefits Pause Memos are a moving target for the parties and the Court. Each day that the hold remains in place is another day closer to the expiration of Plaintiffs' lawful status and work authorization. Other Plaintiffs wait to finalize their naturalizations, along with the attendant benefits of U.S. citizenship. If the hold were lifted today, it would mark a relatively short, albeit still difficult, episode in Plaintiffs' lives. But if the hold remains in place for a significant amount of time, with no end in sight, the conclusion becomes inescapable that Defendants have no intention of adjudicating Plaintiffs' applications and are instead fighting a battle of attrition against these civilians. At the current juncture, undersigned concludes that Plaintiffs have not shown a substantial likelihood of success on the merits of their claim that the Benefits Pause Memos are arbitrary and capricious— at least with respect to applications seeking lawful permanent resident status or

---

[44]   *See* ECF 31, at 23:22–25:17.

naturalized U.S. citizenship. However, undersigned may revisit this conclusion if the hold is not lifted within 60 days of this Order.

### B.    The Negative Factors Policy

Plaintiffs seek a preliminary injunction against the Negative Factors Policy as well, on the ground that the Policy constitutes national origin discrimination. Defendants did not address the Negative Factors Policy in their response. At the preliminary injunction hearing, Defendants relied primarily on the Supreme Court's decision in *Trump v. Hawaii*,[45] which reversed an injunction against the so-called "Muslim Ban," a policy that imposed entry restrictions on five countries with Muslim-majority populations. *See Trump v. Hawaii*, 585 U.S. at 706–11.

Undersigned concludes that Plaintiffs have not carried their burden to show a substantial likelihood of success on their APA claim as to the Negative Factors Policy either. Plaintiffs contend that the Policy constitutes national origin discrimination, which, by virtue of applying a negative discretionary factor to nationals of certain countries but not others, is literally true. But Plaintiffs have not demonstrated to the Court the proper framework for assessing their claim; for instance, there is no indication whether their claim is statutory or constitutional. The distinction is significant: In *Trump v. Hawaii*, the Supreme Court held that "'[a]ny rule of constitutional law that would inhibit the flexibility' of the President

---

[45]    ECF 31, at 38:9–39:18.

'to respond to changing world conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry and national security is highly constrained." 585 U.S. at 704 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81–82 (1976)). At the same time, "although foreign nationals seeking admission have no constitutional right to entry, this Court has engaged in a circumscribed judicial inquiry when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen." *Id.* at 703. Because Plaintiffs have not developed their argument in constitutional terms, Plaintiffs have not carried their burden as to such claim.

Similarly, absent a particular statutory reference, Plaintiffs have not carried their burden to show that the Negative Factors Policy is "not in accordance with law" under the APA. Plaintiffs reprise their arguments that Defendants failed to adopt a reasoned explanation or consider reliance interests in adopting the Negative Factors Policy, as required by the APA. As a threshold matter, the Negative Factors Policy directs adjudicators to consider "Country-Specific Facts and Circumstances" along the lines of PP 10949 and 10998 as one *discretionary* factor in adjudicating immigration applications,[46] and the INA expressly precludes judicial review of Defendants' decisions or actions "the authority for

---

[46] 1 USCIS Policy Manual, pt. E, ch. 8, § C.2., https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-8 [https://perma.cc/CM96-QCF9] (last updated Feb. 3, 2026).

which is specified under this subchapter to be in [their] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). Though it has not been squarely challenged as to the Negative Factors Policy,[47] it appears unlikely that the Court may exercise subject matter jurisdiction over this claim.

But even if undersigned were authorized to reach the merits, Defendants presented an adequately reasoned explanation for the Policy, for the same reasons discussed in Section III.A.2.i., *supra*. And it is unclear how Plaintiffs could have had a reasonable reliance interest in the absence of a single, albeit potentially "significant negative," discretionary factor in the adjudication of their applications.[48] For all of these reasons, Plaintiffs have not carried their burden as to the Negative Factors Policy.

## IV.    CONCLUSION

Plaintiffs' motion for a preliminary injunction [ECF 12] is **DENIED**. Undersigned may revisit this conclusion on a renewed motion if the adjudicative hold is not lifted within 60 days of this Order. Plaintiffs are further granted leave to renew their motion at the appropriate time for certain Plaintiffs with regard to

---

[47] At the preliminary injunction hearing, Defendants asserted in passing that subject matter jurisdiction is lacking for the same reasons as the Benefits Pause Memos, *see* ECF 31, at 39:16–18, but that argument was not developed in such a way to permit reasoned consideration at this stage.

[48] This stands in contrast to Plaintiffs' reasonable reliance interest in having their immigration applications adjudicated at all. *See* Section III.A.1.i., *supra*.

their I-765 employment authorization applications, as discussed in this Order. However, each Plaintiff seeking such preliminary injunctive relief must present specific facts showing that he or she will be irreparably harmed or provide the Court with authority as to why such an individualized showing is not required.

Defendants' motion to dismiss [ECF 29] remains under consideration.

**SO ORDERED** this 13th day of May, 2026.

_____
Steven D. Grimberg
United States District Judge

32